### Case No. 4,136.

### DUNCAN v. KOCH.

[Wall. Sr. 33.][1]

Circuit Court, D. Pennsylvania. May 16, 1801.

---

[1] [Reported by John B. Wallace, Esq.]

Ingersoll and Rawle, who argued for the de-
fendant,

E. Tilghman and Lewis, for plaintiffs,

TILGHMAN, Chief Judge. In considering this question, it is necessary to distinguish between the capture of the vessel and cargo, and the seizure of the cargo by the administration. I shall throw out of the question all idea of loss by the capture; the counsel for the plaintiff have declared that they do not rely upon it, and that they rest their claim solely on the seizure. There is no doubt but the seizure was one of the risks insured against by the policy. 'Tis so conceded by the counsel for the defendant. The only question, then, is, whether the letters from the captain of the 2nd of April and from Mr. Hussey, of the 5th, gave information to the plaintiff that the loss by seizure had actually happened. If they did, the case is with the defendant; for I take the law to be well settled, that the insured must abandon within a reasonable time from his notice of the loss. This reasonable time, generally speaking, should be a short time, a much shorter time than that which elapsed between the receipt of the letter of the 5th of April, and the 20th of June, when the abandonment was made. With respect to this point, upon which the cause turns, I must first remark, that it does not appear the defendant has suffered any injury from the delay of the abandonment. There is no reason to suppose the underwriters could have taken any effectual means to procure payment of the French bills, if the abandonment had been made at the time they contend it ought to have been. I must also remark that the plaintiff acted candidly. His communication in his letter of 30th April to Philips, Cramond & Co. contained every thing material that he knew; that is to say, the acquittal of vessel and cargo, and the opinion of his agent, Mr. Hussey, that the cargo would be taken by the government. There was no occasion to mention the letter of the captain, because it was two days prior to Hussey's, and because it was evident that the information of Hussey, who had been principally instrumental in procuring the acquittal of the vessel and cargo, was more to be relied on than that of the captain.

Now we will consider those two letters of the 2d and 5th of April. It is evident the letter of the 2d contained no account of the seizure; because at that time the trial had

not taken place; and it was more than possible, that the vessel and cargo might be condemned as prize. Then what information was contained in the letter of the 5th? Why, substantially this, that the government would take the cargo. At what time they did take it, we know not. The case states that it was taken after the acquittal,, which took place about the 4th of April. But there is no proof that the seizure had taken place on the 5th. Then ought we to presume, can we presume this essential fact, to the prejudice of the plaintiff, who has acted in all respects fairly and openly? It is said his own letters show, that he considered the loss as having taken place. His letters show, that he confidently expected the loss had taken place on the 28th of April, when he wrote to Hussey; and he well might expect it. The underwriters, no doubt, had the same expectation from the communication made to them by Philips, Cramond & Co.: but there is no ground to say the plaintiff ever lay by one moment with the view of taking the chance of what might turn up with the French government. On the contrary, his letter to Hussey of the 28th of April is decided, that he shall at all events suffer a considerable loss, and that he must abandon. And every man of intelligence must have known, that at the period of those transactions, the chance of bills by the administration drawn on France, was a bad one. I take for granted from the whole correspondence, that the only reason why the plaintiff did not abandon on receipt of the letter of the 5th of April, was, that he did not consider that letter as a document sufficient to entitle him to abandon. Nor do I think that the underwriters would have paid, without further proof that a loss had actually taken place. I am therefore of opinion that it was not incumbent on the plaintiff to make an abandonment on the first receipt of the letter of the 5th April from James Hussey.

BASSET, Circuit Judge, was absent.

GRIFFITH, Circuit Judge. I lay out of the case what has been said of the first capture amounting to a total loss, or the taking by the administration a continuance of the loss. It will not bear an argument, and was fully answered by the counsel for the plaintiff. Then as to the seizure of the cargo, by the administration: this to be sure was in its nature a total loss: not only defeating the voyage, but an actual conversion of the property. In these circumstances, the insured had a right to abandon, and ought so to have done. Nothing is truer or more reasonable, than that the insured should, in such cases, act fairly. He is not to play at fast and loose; to keep the insurer at bay, while he avails himself of the chances of gaining by the loss. What Lord Kenyon says in Allwood v. Henchell, cited in Park. Ins. 280, is very reasonable, "He must make his

election speedily, whether he will abandon or not, and put the underwriter into a situation to do all that is necessary for the preservation of the property, whether sold or unsold. He cannot lie by and treat the loss as an average loss, and take measures for the recovery of it, without communicating that fact to the underwriters, and letting them know the property is abandoned to them." But this election to abandon, (for it is optional in the assured,) cannot be made until the calamity has happened; nor to give it effect, is it necessary on the part of the assured, to give notice of it until he has received certain information of it. The only question here is, whether from the letter of the 5th April, 1797, the plaintiff had received such certain information of the loss by seizure of the cargo, as to make it incumbent on him to give notice of abandonment. By adverting to the case stated, it appears that the actual seizure, and the loss consequent thereon, had not happened when Hussey wrote this letter. It is a fair presumption that it did not happen until after the 5th; for in that letter he says, "The vessel was delivered up to the captain yesterday (the 4th of April) but government will take the cargo," not that it was taken. And the case further states, that it was after the acquittal in the admiralty that the cargo was seized. When Duncan received this letter, it gave him no certain account that the loss had happened, in the event of which he intended or was entitled to abandon. The utmost he could collect from either or both the letters, was, a high probability, and almost certain conviction, that this would be the issue. He seems, indeed, by his letters of the 28th to Hussey, and 30th of April to Philips, Cramond & Co. to have made up his mind that this was to be the fate of the cargo. Still however, as a ground to abandon, he had not received information of an actual loss. Indeed, the probability is, the seizure was not made on the 5th. It cannot be collected from Hussey's letter, that the administration had then fixed its "fangs" (to use the expression of one of the counsel.) upon the cargo. Thompson and Hussey, indeed, considered it as a thing in course, and spoke of events to come, as if they had already transpired; under a full conviction they would happen: but the "forcible seizure" mentioned in the case was not then made. Duncan could, therefore act no otherwise than he did act; to tell the insurers what had happened; what was likely to happen; and that if the impending loss did happen, he would abandon in toto. All this he told them immediately on receipt of Hussey's letter on the 5th of April, in his to Philips, Cramond & Co. of the 30th. What if he had gone to the underwriters and showed his letters, and offered to abandon. They might have said, "You are too hasty; your cargo does not appear to be lost; you call for the insurance money before it is certainly payable; your agent may have so managed

things that the Mary may now be on her voyage to Kingston; we will not accept your abandonment and pay the loss, before we know it has happened."

In the circumstances of this case, the plaintiff was justifiable in writing for the confirmation of the loss. His idea, indeed, seems to have been, that he ought to have a protest of the loss before he could abandon. It was argued against the plaintiff, that he was fully convinced of the loss; that he was mentally as certain of it, as if the protest had been in his hand; and that it was with a view to see what would come of the French bills, (which were nominally a great price for his flour,) that he delayed an immediate abandonment. I should perhaps agree, though I speak not with certainty on this point, that though his information was not certain, yet if he firmly and undoubtedly believed a loss had happened, and so it afterwards appeared, and he deferred an abandonment with a view to take the chance of the bills, if good, or abandon them to the underwriters, if bad; in such case he ought not to recover for a total loss, but the bills would be considered as his own. But there is not the least evidence of his delaying to surrender on any calculations of this kind. On the contrary, from the first moment, he considered the seizure as injurious, and resolved to come on the underwriters. On hearing the government would take the cargo, he writes to Hussey on the 28th of April, "That it was a most iniquitous proceeding, and would at any rate be a considerable loss to him and others concerned," and adds, however, that they were insured, and requests him to send a protest. But what is decisive as to the intent of the plaintiff in not making a formal abandonment on the letter of the 5th of April, is his communication to the underwriters on the 30th. He informs them of the situation of the cargo, that government would seize it, at least Mr. Hussey expected it, and in that case, he should abandon. If he designed to keep them at bay, and take the chance of a market for the bills, he would not have written this letter. In fact, by this letter he precluded himself from the possible contingency of gain in the alternative of the bills proving good; for I consider, that on this letter the underwriters would have been entitled to the proceeds. It was a conditional abandonment, and if the loss happened by the seizure as contemplated, the abandonment in favour of the underwriters would have related to the 5th of April, 1797, upon the contents of his letter of the 30th, which says positively, "If the loss happens, I must abandon," and desires this to be communicated to them, "for their government."

Upon the whole, I consider this a very plain case for the plaintiff. He was not bound to relinquish, nor could he with propriety have relinquished the cargo to the insurers, on the letter of the 5th of April; because this letter did not give an account of an actual loss. Nor ought he to lose his assurance upon the ground that in fact the loss had happened, and he was fully convinced of it, though not positively informed; but delayed with a view to speculate on the bills, considering them as his own: for no such intent appears; but the contrary. From the first he resolved to abandon; and as soon as he received certain notice of the loss did do it. All the acts of Hussey must be taken in this case for the common interest, and not done as by the special agent of Duncan. In cases of this kind, it is difficult to propose a rule, by which to determine what shall be notice of a loss, to the assured: much must depend on circumstances. If the loss be well authenticated or well known, immediate dereliction should be tendered by the assured. If not certainly known, but from strong evidence fully believed, and the assured suspends his option with a view to avail himself of some favorable contingency for the disposition of the property insured on his own account, this might, if the loss had in fact happened, (though I do not say it would,) turn the property upon him, at its full or supposed value. But such intent must certainly be proved, and clearly proved—not inferred from slight circumstances, or from the probability that such would naturally be a motive with the assured for delaying a surrender to the underwriters. In this case there was neither full notice of the loss on the 5th of April; nor has any artifice or improper procrastination appeared on the part of the plaintiff. Judgment must therefore be entered for the plaintiff.